UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORGE AUGUSTO SOLARES RUANO,<br>also known as "Pelon"<br><br><br>Defendant. | **FILED UNDER SEAL**<br><br>Case: 1:23-mj-00183<br>Assigned to: Judge Meriweather, Robin M.<br>Assign Date: 7/26/2023<br>Description: COMPLAINT W/ ARREST WARRANT |

**AFFIDAVIT OF SPECIAL AGENT KELLY CHANG IN SUPPORT
AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Kelly Chang, being duly sworn, hereby depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since September 2010.  I am currently assigned to Los Angeles Field Division, Financial Investigations Group.  The DEA is responsible for the enforcement of federal laws, including those related to drug trafficking.  As a DEA Special Agent, I have received training and conducted or assisted in numerous federal drug investigations.  I have debriefed numerous defendants, informants, and witnesses with personal knowledge regarding major drug trafficking organizations.  Additionally, I have participated in many aspects of drug investigations including undercover operations, surveillance, and arrests.

2.      I have participated in investigations into the unlawful possession with intent to distribute and distribution of narcotics and controlled substances, the laundering of narcotics proceeds,

1

trafficking of controlled substances and listed (precursor) chemicals, the acquisition of firearms by drug traffickers for the purpose of furthering illegal activities, and conspiracies associated with narcotics offenses. I am familiar with narcotics traffickers' methods of operation, including the manufacturing, storage, transportation, and distribution of narcotics, and the collection and laundering of money that represents the proceeds of narcotics trafficking. I am also familiar with the manner in which narcotics traffickers transport and distribute narcotics in areas they control.

3. This affidavit is submitted for the limited purpose of establishing probable cause in support of a Criminal Complaint charging JORGE AUGUSTO SOLARES RUANO ("SOLARES RUANO") with conspiracy to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing, intending, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963.

4. It is unlawful "to manufacture or distribute a controlled substance in schedule I or II . . . intending, knowing, or having reasonable cause to believe that such substance . . . will be unlawfully imported into the United States . . . ." 21 U.S.C. § 959(a). Pursuant to 21 U.S.C. § 963, "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

5. Additionally, 21 U.S.C. § 959(d), establishes that Section 959(a) is "intended to reach acts of . . . distribution committed outside the territorial jurisdiction of the United States." Pursuant to 18 U.S.C. § 3238, there is statutory venue in the District of Columbia for "all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or

district" where the defendant has no last known residence in the United States.

6.     The information contained within this affidavit is based upon my own investigation and upon information provided to me by other law enforcement officers. Where conversations or statements of others are related herein, they are related in substance and in part. In some instances, the communications described in this affidavit were originally made in Spanish; in those cases, my knowledge is derived from draft English translations. Moreover, because this affidavit is submitted for a limited purpose, I have not set forth every fact that I have learned in the course of the investigation.

## PROBABLE CAUSE

7.     The DEA has an extensive, long-term, and ongoing investigation into the drug trafficking and money laundering activities of a drug trafficking organization ("DTO") based in the San Marcos Department of Guatemala, which is located on the Pacific Ocean and borders Mexico. During the course of the investigation, DEA agents learned that the DTO was responsible for transporting thousands of kilograms of cocaine into Guatemala that were further transported through Mexico and ultimately into the United States for distribution.

8.     From June 20, 2018 to May 31, 2019, agents received authorization from the U.S. District Court for the Central District of California to intercept the communications of a network of BlackBerry Messenger (BBM) accounts located within Guatemala and Colombia. Between March 6, 2019, and April 1, 2019, investigators intercepted BBM communications between members of the DTO coordinating a shipment of 4,260 kilograms of cocaine via a semi-submersible from Colombia to Mexico.

9.     On March 11, 2019, a DTO member using the BBM username "Centenario" sent BBM

username "Ore" a photograph of the coordinates (N 14°34'00.0, W 093°20'00.0), which is approximately 57 nautical miles west off the coast of Tapachula, Mexico. More specifically, the coordinates identify a location off the coast of the Mexico-Guatemala border, specifically between the towns of Paredón, Mexico, up to Tapachula, Chiapas, Mexico. From my training, experience, and knowledge of this investigation, I believe that "Ore" was responsible for using the coordinates to arrange a mid-sea meeting of vessels.

10. I know, from my training, experience, and knowledge of this investigation, that drug traffickers operating in this area often transport large quantities of cocaine from South and Central American countries such as Colombia into Guatemala by sea. Often the traffickers send small boats known as *lanchas* to meet the larger vessels transporting the cocaine from South America. The traffickers then ferry the cocaine from the larger vessels to the shores of Guatemala on the *lanchas*. Once in Guatemala, the traffickers sell or transport the cocaine by land across the Guatemala–Mexico border. Once in Mexico, traffickers transport the large quantities of cocaine by land to the Mexico–U.S. border and across that border into the United States, where the cocaine can be sold for a larger profit margin and increase the return on investment for the investing parties.

11. On March 24, 2019, a DTO member using the BBM username ".Chilena" exchanged the following messages with "Centenario:"

> Chilena: I believe they will arrive around Thursday.
> Centenario: OK, buddy. Over here we are ready for the "party.

12. Based on my review of Mexican law enforcement reports and knowledge of the investigation, on March 27, 2019, DEA provided Mexican law enforcement authorities with the designated coordinates "Centenario" provided to "Ore" on March 11, 2019, as described above.

13. On March 28, 2019, a Mexican Navy, La Secretaría de Marina – Armada de Mexico

("SEMAR") aircraft sighted a semi-submersible transferring objects to three smaller vessels, or *lanchas*, two of which were identified by the names "JORDAN" and "LUZ CANDY", near the coordinates relayed between Mexico and Guatemala. The SEMAR aircraft was able to video record the unloading of the semi-submersible. A SEMAR vessel pursued the semi-submersible. The semi-submersible eluded the Mexican military vessel and was found abandoned near the border of Mexico and Guatemala. Subsequently, Mexican law enforcement searched the abandoned semi-submersible, and recovered two one-kilogram bricks of cocaine, each containing the stamp "exito." Based on my training, experience, and knowledge of the investigation, I know it is common for drug traffickers to place stamps or labels on their drugs to identify them. Additionally, drug traffickers often use stamps as a means of branding their products to tout its quality and/or potency.

14. On March 29, 2019, "Centenario" informed a DTO member using BBM username "CÓNDOR ANDINO" that he/she chose to have the cocaine delivered on the Mexican side of its border with Guatemala in order to evade detection from law enforcement.

| Centenario: | Thank God, everything turned out well… |
| | I sent my personal pilot and the man is very sharp…. |
| CÓNDOR ANDINO: | How much arrived? Make sure to share, dummy. |
| | About $1,000 for each one. |
| Centenario: | I dropped off on the Mexican side. So you see I do learn. |
| | Don't think I'm that stupid. |

Based on my training, experience, and knowledge of the investigation, when "CÓNDOR ANDINO" asked "Centenario" to "share," he/she was asking for a commission of $1,000 for each kilogram of cocaine transported.

15. On March 30, 2019, a DTO member using the BBM username "CANAAN" alerted "Centenario" that two of the 4,260 kilograms of cocaine were abandoned due to the presence of

5

law enforcement:

> CANAAN: Good morning, buddy. To let you know 2 were missing and 3 came out wet. The man said he sent 4,260 and it came out to 4,258. And one of the suitcases was open. He said to have him look for the address around there, more or less, where they can meet…
>
> Centenario: The 2 "things" were left there. They did not have time to sink it, they were surrounded.

Based on my training, experience, and knowledge of the investigation, I believe that "CAANAN" was informing "Centenario" that the cocaine source of supply sent 4,260 kilograms of cocaine, but two kilograms ("things") were left on the semi-submersible and three kilograms were wet, and that the workers were not able to sink the semi-submersible due to the presence of SEMAR.

16. BBM communications revealed that the DTO intended to transport the cocaine within Guatemala and subsequently sell it for further distribution. On March 30, 2019, "Centenario," exchanged the following messages with "CANAAN":

> Centenario: I have a good customer for that "material", but I only want to give him 500.
>
> CANAAN: Yes, buddy, please. But I say to just give out samples and we will start delivering on Monday. So we can see how the area is, if it is hot. Or we should deliver tomorrow. Mine will rest today because they're still inside the warehouse, putting everything away…
>
> Centenario: I have a man that will pay me at 14,800. If you want, just give me 500.
>
> CANAAN: Oh all right, buddy. That will be yours because I am going to wait a bit for mine. We'll see, I might be able to sell them a bit higher. I'll give them to you either tomorrow or Monday. There's unmarked law enforcement down there, near the "mueble" and it seems like the area is burnt… You send them to Limonsitos, they'll deliver there. I mean, I have a house there.

Based on my training, experience, and knowledge of the investigation, I believe "Centenario" stated that he/she has a client that will pay him/her $14,800 per kilogram of cocaine, but

"Centenario" only wanted to sell 500 kilograms to that particular client. "CANAAN" indicated that he/she wanted to sell his/her share of cocaine at a higher price and start delivering the cocaine the next day.

17. Based on my review of Guatemalan law enforcement reports, on April 1, 2019, Guatemalan law enforcement agencies established surveillance on a known route utilized by the DTO. Guatemalan National Police ("GNP") conducted a traffic stop of a red Ford Explorer driven by Co-Conspirator-1 ("CC1"). Subsequent to the search, Guatemalan authorities seized 1,111 kilograms of cocaine with the stamp "exito," and arrested CC1, the driver of the red Ford Explorer. The cocaine seized by SEMAR on March 28, 2019 contained the identical stamp, "exito," as the cocaine that was seized by GNP on April 1, 2019. Based on my training, experience, and knowledge of the investigation, I believe that the cocaine seized by SEMAR and GNP belonged to the DTO.

18. BBM communications from April 2-5, 2019, revealed that members of the DTO used an attorney named "Pelon" to bribe the judge and prosecutor presiding over CC1's Guatemalan criminal case to secure CC1's release.

> CÓNDOR ANDINO: And how's the attorney doing? Attorney Pelon? To find out where [CC1] is and see what can be done. So the guy can see that he already has an attorney. So he can check him in and they don't beat up [CC1]…Now we have to give support to the guy who's in jail. And lower the years or see if we can get him out. Etc. He's calm because he knows he has to pay. But anyway, the toad will come up.
> Tajin: And what is Lic Pelon going to do, cousin?
> CÓNDOR ANDINO: He is going to send me the information of how much it's going to be to get [CC1] out and that way, I can pass on the price, cousin…
> Tajin: All right, cousin. He asked me if at the end he is going to continue. They already got two cell phones out.
> CÓNDOR ANDINO: And let me know. Yes, have him take the cell phones out.

7

|  |  |
|---|---|
|  | And that way he is going to see how much it's going to be to do all the work to get that guy out, etc. He already knows what I told you. |
| Tajin: | All right, cousin. Have him go at it with everything.  All right. They already took two cells out. |
|  | … |
| Tajin: | Cousin, Lic is coming at 10:00. He wants to talk. I don't know what you think. I don't know if it's today or tomorrow… He says they want the 300 at 10:00 am tomorrow. |
| CÓNDOR ANDINO: | Okay, cousin. Is there any money? They will take a car, etc. Or see who will buy a car at a good price, cousin. To look into that. |
| Tajin: | What kinds of cars, cousin, if there's no money? This is tough, cousin. |
| CÓNDOR ANDINO: | The ones he has. Bravus at a good price. The black Ranch, good price and Lexus automobile, good price. The thing is to come up with the $300 for Lic… We'll see what attorney Pelon has to say. |
| Tajin: | I already talked to the attorney and those guys want money not cars, cousin… You guys are giving the attorney a truck. |

19.  Based on my training, experience, and knowledge of the investigation, I know it is common for drug traffickers to utilize their network and associates to facilitate and foster drug-related business transactions with other drug traffickers.  Additionally, I know that large-scale DTOs such as the DTO described here have access to or employ attorneys that can help associates of the DTOs to avoid prosecution or jail time for violating local laws, so that those individuals can continue their drug trafficking without being apprehended or prosecuted.  Leaders of the DTOs seek the release of their subordinates, such as CC1, to avoid their subordinates cooperating with law enforcement about them and the DTO's activities. In the above communication, "CONDOR ANDINO" told "Tajin," that they have to support CC1 because he's in jail and wanted CC1 to know that he/she had an attorney to persuade CC1 to not cooperate with law enforcement. "CONDOR ANDINO" also told "Tajin," that SOLARES RUANO is "calm because he knows he

has to pay." Based on my training, experience, and knowledge of the investigation, I believe that this demonstrates that SOLARES RUANO was aware that he had to bribe the appropriate Guatemalan officials in order to secure CC1's release.

20. Additionally, "CONDOR ANDINO" mentioned that, "the toad will come up." I know based on my training and experience, that Guatemalan traffickers use the word "toad" in a pejorative context to refer to someone who is cooperating with law enforcement. I also know from my conversations with a cooperating witness, discussed below, that "300" means $300,000 USD, which was the amount of money given to SOLARES RUANO to bribe the Guatemalan judge and prosecutor to secure the release of CC1. "Tajin" subsequently stated: "I already talked to the attorney and those guys want money not cars, cousin…" Based on my training, experience, and knowledge of the investigation, during the above communications, co-conspirators discussed offering various vehicles as payment for the bribes, SOLARES RUANO informed "Tajin" that "those guys only want money, not cars." I believe these intercepts corroborate the fact that SOLARES RUANO spoke with the judge and/or prosecutor and offered vehicles as payment for the bribe, but they indicated to SOLARES RUANO, that they would only accept cash.

21. During the investigation, DEA interviewed several cooperating witnesses. Cooperating Witness 1 ("CW-1") was a member of the DTO.[1] CW-1 positively identified SOLARES RUANO in a photograph array and stated that he/she knew the person in the photograph is an attorney known as "Pelon."

---

[1] CW-1 pleaded guilty to conspiracy to distribute five (5) kilograms or more of cocaine, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963. CW-1 is cooperating in exchange for leniency at sentencing.

22. According to CW-1, he/she participated in conversations with SOLARES RUANO about the payment of bribes to the prosecutor and judge to release CC1. CW-1 met with SOLARES RUANO to discuss paying bribes to secure the release of CC1. SOLARES RUANO told CW-1 that "everything will be alright and there is another lawyer that can help, and the lawyer is in Xela." Based on my training and experience, I know that Guatemalans often refer to the city of Quetzaltenango as "Xela." CW-1 agreed to pay SOLARES-RUANO a total of $400,000 in United States currency, so that SOLARES-RUANO could use that money to bribe the Guatemalan judge and prosecutor associated with CC1's case and ultimately secure CC1's release.

23. CW-1 further stated that SOLARES-RUANO advised CW-1 that CC1 would not be released from jail immediately to avoid raising any suspicion of impropriety. SOLARES-RUANO further told CW-1 that he needed $200,000 to bribe the presiding judge, $100,000 to bribe the prosecutor, $50,000 to pay the local attorney representing CC1 in the criminal case, and he (SOLARES-RUANO) would keep the remaining $50,000 as his fee for facilitating the bribes. CW-1 hired SOLARES RUANO because of SOLARES RUANO's reputation for bribing officials to secure the release of drug traffickers in the past. Furthermore, CW-1 hired SOLARES RUANO solely to bribe the necessary officials to secure the release of CC-1 to prevent him/her from cooperating with law enforcement. CW-1 stated that "Pelon" (SOLARES RUANO) was paid approximately $300,000 in United States currency to arrange the bribes. CW-1 also stated that SOLARES-RUANO told CW-1, that he (SOLARES-RUANO) went to speak to CC1 while he was incarcerated to tell CC1 "not to worry and he would get him out."

24. According to CW-1, approximately a month after CW-1 paid SOLARES-RUANO, SOLARES-RUANO told CW-1 that he (SOLARES-RUANO) could not get the "boy" out,

referring to CC1.    SOLARES-RUANO told CW-1 that it was too soon for CC1 to be released, so he had to stay in the jail for five months.    SOLARES-RUANO stated that if CC1 was released too quickly it could possibly be on the radar of the press since CC1's arrest and subsequent seizure had generated a lot of local press coverage.    CW-1 stated that CC1 was ultimately released as result of the bribes that SOLARES RUANO paid on to the presiding judge and prosecutor.

25.    Based on my review of Guatemalan law enforcement reports and my conversations with several cooperating witnesses, I confirmed that CC1 was released from jail in or around August 2019 approximately five months after CC1's arrest, which was an unusually brief amount of incarceration under Guatemalan law considering the large amount of cocaine that was seized from his vehicle.

26.    CW-1 stated that another co-conspirator (CC2) used Pelon's services, including representing CC2 in extradition proceedings to the United States.    CW-1 also observed papers in Pelon's custody that related to U.S. indictments and extradition.    Based on my training, experience, and knowledge of the investigation, I believe that SOLARES RUANO therefore knew that the cocaine handled by the traffickers whom he aided was destined for the United States.

27.    A second cooperating witness ("CW-2") was a member of the DTO.   CW-2 participated in cocaine shipments involving CW-1.[2]    CW-2 positively identified SOLARES RUANO in a photograph array.    CW-2 identified the person in the photograph as SOLARES RUANO and described SOLARES RUANO as an attorney who went by the name "Pelon".

---

[2] CW-2 pleaded guilty to conspiracy to distribute five (5) kilograms or more of cocaine, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963. CW-2 is cooperating in exchange for leniency at sentencing.

28. CW-2 participated in conversations with members of the DTO who paid SOLARES RUANO to bribe Guatemalan officials to release CC1. According to CW-2, in 2015, CW-2 paid SOLARES-RUANO $400,000 in United States currency to bribe the judges and prosecutors to secure the release of the five individuals who were arrested after their vessel was seized containing approximately 900 kilograms of cocaine off the coast of Guatemala. According to CW-2, SOLARES RUANO personally paid the presiding judge to secure the individuals release without conviction.

29. CW-2 further knew "Pelon" as an attorney who could assist drug traffickers with obtaining the release of arrested individuals.

## CONCLUSION

30. Based on the foregoing facts, I respectfully submit that probable cause to believe that, in 2019, SOLARES RUANO did knowingly, intentionally, and willfully conspire with CW-1, CW-2, CC1, and others to distribute five (5) kilograms or more of cocaine, a Schedule II controlled substance, intending, knowing and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(1), and 963.

Respectfully submitted,

                                                                    _____

Kelly Chang
Special Agent
Drug Enforcement Administration

Sworn and subscribed before me this
_____ 26th  day of July, 2023
at Washington, DC

_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE